UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELMER VAN GORDER,

     Plaintiff,     No. 05-CV-70380-DT

vs.            Hon. Gerald E. Rosen

GRAND TRUNK WESTERN RAILROAD,
INC., a division of Canadian National,

     Defendant.
_____/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _September 29, 2006_____

PRESENT:  Honorable Gerald E. Rosen
      United States District Judge

## I. INTRODUCTION

This action arises out of an incident which occurred on October 17, 2003, when

Plaintiff Elmer Van Gorder, while employed as a carman by Defendant, Grand Trunk

Western Railroad, Inc., ("Grand Trunk"), injured his right shoulder when he attempted to

close the left clamshell door of a bi-level auto carrier railcar.  On February 2, 2005, Mr.

Van Gorder filed the instant negligence lawsuit against Grand Trunk pursuant to the

Federal Employer's Liability Act, 45 U.S.C. § 51, *et seq.*  Discovery has closed and

Defendant has moved for entry of summary judgment in its favor.  Plaintiff has responded

to Defendant's Motion and Defendant has replied.

The Court heard oral argument on this matter on July 20, 2006.  At the conclusion of this hearing, the Court took the matter under advisement.

Meanwhile, counsel for the parties advised the Court that the parties were pursuing extra-judicial facilitation in an attempt to resolve this matter and, accordingly, requested that the Court withhold deciding the summary judgment motion.  On September 5, 2006, however, the parties informed the Court that they failed to reach a resolution through facilitation and therefore, requested that the Court issue its decision.  Accordingly, the Court now issues this Opinion and Order setting forth its ruling on the matter.

## II.  PERTINENT FACTS

Plaintiff Elmer Van Gorder, born July 4, 1952, is a life-long resident of Durand, Michigan. At the time of the accident giving rise to this action, Van Gorder had worked for the Defendant railroad for approximately 33 years, since July 22, 1970.

Van Gorder was hired by the Defendant as a T-carman and has continued to work as a carman out of the Defendant's Flint Yard until the time of the subject October 17, 2003 incident. Plaintiff's primary job since 1981, was working at the GM loading dock at David Road, where the accident occurred. He worked the day shift, 7:00 a.m. to 3:00 p.m., Monday through Friday.

On October 17, 2003, Plaintiff was placing bridge plates between bi-level cars that had been delivered to the David Road loading dock.  Bi-level railcars were delivered to the dock previously prepped and inspected by the Grand Trunk. On the day of the

2

accident, the railcars had been pre-inspected by the Grand Trunk and consequently, the railcar doors were open. Van Gorder was working with another crew member, Doug Haskins, removing bridge plates from the railcars. During the course of his normal duties, Van Gorder attempted to close the clamshell door of the Grand Trunk bi-level car.  In the course of this process, the door suddenly jammed and stopped, causing Plaintiffs hands to slip off the end of the door and he fell, injuring his right shoulder. John P. Jaques, Mechanical Department Supervisor and Technical Officer – Pool Operations, also verified that during the inspection of the door following Plaintiffs injury, he was only able to close the door partway.

Following Plaintiff's accident, Robert F. Miller, Car Foreman, along with Jaques, Flint Assistant Superintendent Ron Lord, Flint Superintendent Hunt Carey, and Risk Mitigation Officer David Cromie performed a mechanical inspection of railcar TTGX9985596.  During this post-accident inspection, it was determined that the canopy bolt on the top of the cars AR door was defective and worn.  This defective bolt caused the door to become stuck during closing.  At issue in this case is whether this defect should have been discovered by Grand Trunk during its pre-delivery inspection of the railcar, ergo providing a safe working conditions for Plaintiff.  The car was allegedly inspected twice by Grand Trunk prior to Van Gorder's accident: once upon arrival at the Grand Trunk David Road Yard and once when the door was inspected solely by opening, but not closing the door.

3

A.    <u>Car Inspection Procedures at David Road</u>

The GM plant at David Road in Flint, Michigan produces only trucks and SUVs. Therefore, all auto carriers delivered at David Road for loading are bi-level railcars. Bi-level auto railcars are delivered on the midnight shift or early in the day shift at David Road and spotted along the loading docks.  The David Road loading docks have six tracks, each with the capacity of five bi-level cars.

Auto carrier bi-level railcars delivered to the David Road GM facility are generally pre-inspected at Bristol Yard in Flint, prior to their delivery to the David Road loading docks in Flint.  Inspection of the cars is a multi-step process that is inconsistent in its execution and is not entirely clear from the testimony of record.  Apparently, the pre-inspection includes opening the doors of the railcar to determine whether any lubrication, cleaning or any repair is needed prior to being delivered to the David Road loading dock. If, during the pre-inspection, an exception is taken to the condition of the railcar and/or door of the railcar, it will be repaired on site, if possible or "bad-ordered" and moved to a repair facility, if it cannot be repaired on site.

There were times when the bi-level railcars would arrive at the David Road loading dock without having been previously prepped and inspected.  This lack of a pre-inspection was indicated by closed doors on the railcars.  If the railcars had not been inspected and prepped, it would then be the job of Van Gorder and Haskins' to open the doors on the cars and inspect the A and B deck for safety appliances, chocks, broken straps, etc., prior to placing in the bridge plates for loading.  Regardless of this inspection

4

status of the cars, it was the job of Van Gorder and his crew member, Doug Haskins, to put in bridge plates between the bi-level cars on the A and B decks of the railcars to enable the loading of all five railcars on the six tracks at the dock. The actual loading of the cars would be performed by GM and/or its contractor. Once the railcars are loaded by GM and/or its contractor, the next step was for Van Gorder and Haskins to inspect the cars to insure they were properly chocked and strapped down. They would remove the bridge plates and close the railcar doors. Van Gorder testified that the procedure at the time of the accident was for his partner to walk ahead of him on the bottom deck and take down the top bridge plates. His partner would step on the release lever and open the door six to eight inches and Van Gorder would then shut the doors.

B.    Incident of October 17, 2003

Van Gorder reported for work at the David Road yard shortly before the start of the shift at 7:00 a.m. on October 17, 2003, and the accident occurred at approximately 12:15 p.m. The docks were loaded with railcars and some of the railcars had already been loaded with GM trucks and SUVs, with the doors closed. Most of the railcars had been pre-inspected at the prep track at the Bristol Road yard, as the doors of the railcars were locked open.

Van Gorder and Haskins, worked in their normal manner, as described above removing bridge plates from the railcars. Haskins was working approximately two cars ahead of Van Gorder releasing the pins for the doors. The doors on the railcar at issue here, car number TTGX985596, were locked open, indicating that it had been pre-

5

inspected in Bristol.  Van Gorder, therefore, did not inspect the doors.

Van Gorder had just completed inspecting the A-deck (bottom deck) of TTGX985596 when he got down to close the doors.  Van Gorder was standing on the ground facing the left clamshell door as he attempted to close the door, pulling from left to right using both hands, with his right hand doing most of the pulling.  The door initially moved freely and with no resistance.  After moving the door approximately half way closed, the door, without warning, completely stopped causing both of his hands to slip off the end of the door and he nearly fell down.  Van Gorder then felt a sharp pain in his right shoulder as well as in his fingers. Van Gorder had experienced problems with doors "hanging up" in the past, but not to the extent of the incident that caused his injury. Immediately after the incident, Van Gorder informed Haskins that he had injured his shoulder and hands as a result of attempting to close the door. He was taken to McLaren Medical Center for treatment.

C.    Investigation of the Incident

Mr. Miller, Van Gorder's supervisor and Car Foreman, was advised by telephone of the alleged injury incident.  On the day of the incident, Miller spoke with Plaintiff at the doctor's office where Van Gorder was being treated, and was present when Plaintiff was interviewed concerning the accident by Defendant's Risk Mitigation Officer, Dave Cromie.  Also present during Van Gorder's recorded interview was John Jaques, Mechanical Supervisor and Technical Officer.  Following the interview with Van Gorder, a mechanical inspection of railcar TTGX9985596 was undertaken.

6

D.    Mechanical Inspection of Railcar TTGX9985596

Railcar TTGX9985596 was taken by the switch crew to the RIP (repair-in-progress) track in Flint, for mechanical inspection. At 3:30 p.m., on October 17, 2003, Mr. Miller, Car Foreman at Flint RIP track, performed an inspection of the railcar along with John P. Jaques, Mechanical Department supervisor and Technical Officer – Pool Operations, Flint Assistant Superintendent Ron Lord, Flint Superintendent Hunt Carey, and Risk Mitigation Officer David Cromie. Initially, Miller and Jaques were unable to visually determine any problem with the railcar door.  However, after being elevated over the top of the roof of the railcar in a man lift bucket inside the repair facility, they were able to determine that the canopy bolt on the rooftop of the AR door was worn.  Miller explained that on the roof of the car, where the door hooks into the top of the car, there is a pivot arm or bolt upon which the door swings or rotates as the door opens and closes. The mechanical inspection revealed that the AR door on the railcar was able to be opened without problems.  The defect in the door manifested itself in closing the door, by stopping, before it was able to be fully closed.  According to the unsworn affidavit of Mr. Jacques, the Bi-level auto carrier TTGX9985596 was not owned by the Defendant railroad, but was owned by the Union Pacific Railroad and interchanged with the Defendant railroad for delivery at the GM plant serviced by the David Road loading facility.

D.    Plaintiff's Complaint in this Action

Van Gorder initiated this action in this Court on February 2, 2005. In his

7

Complaint, Plaintiff alleged that Defendant Grand Trunk was negligent in failing to provide the Plaintiff with a safe place to work; failing to properly warn the Plaintiff of possible hazards to his health; failing to keep its equipment and property in a proper and safe manner properly inspect, repair, and maintain its equipment and property; failing to comply with State and Federal Statutes including, but not limited to 45 U.S.C. § 51 et seq. and related Federal and State Rules ad Regulations promulgated thereunder, including, but not limited to 49 C.F.R § 215; failure of the Defendant to properly operate the job, together with other negligent acts or omissions; and in the general reckless, careless and negligent manner in which the Defendant, its agent, servants and employees conducted its business.

Van Gorder alleged these acts caused him to suffer physical and emotional injuries, metal anguish, embarrassment, humiliation, disability, lost wages, denial of social pleasure and enjoyments, change of lifestyle, and future damages.

### III. DISCUSSION

A.  <u>STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT</u>

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases -- *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986);

8

and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) -- ushered in a "new era" in the

standards of review for a summary judgment motion.  These cases, in the aggregate,

lowered the movant's burden on a summary judgment motion.[1]  According to the *Celotex*

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of

principles to be applied to motions for summary judgment.  They are summarized as

follows:

> * The movant must meet the initial burden of showing "the absence of a genuine
> issue of material fact" as to an essential element of the non-movant's case.  This
> burden may be met by pointing out to the court that the respondent, having had
> sufficient opportunity for discovery, has no evidence to support an essential
> element of his or her case.

> * The respondent cannot rely on the hope that the trier of fact will disbelieve the
> movant's denial of a disputed fact, but must "present affirmative evidence in order
> to defeat a properly supported motion for summary judgment."

> * The trial court no longer has the duty to search the entire record to establish that
> it is bereft of a genuine issue of material fact.

> * The trial court has more discretion than in the "old era" in evaluating the
> respondent's evidence.  The respondent  must "do more than simply show that
> there is some metaphysical doubt as to the material facts."  Further, "[w]here the

---

[1]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A C. Wright, A. Miller, M. Kane, <u>Federal Practice & Procedure</u>, § 2727, at 35 (1996 Supp.).

record taken as a whole could not lead a rational trier of fact to find" for the
respondent, the motion should be granted.  The trial court has at least some
discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996).  *See also,*

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  The Court will

apply the foregoing standards in deciding Defendant's motion for summary judgment in

this case.

B.   PLAINTIFF HAS FAILED TO MAKE OUT A CLAIM OF NEGLIGENCE

The Federal Employers' Liability Act, ("FELA"), provides, in part,

> Every common carrier by railroad while engaging in commerce between
> any of the several States . . . shall be liable in damages to any person
> suffering injury while he is employed by such carrier in such commerce . . .
> resulting in whole or in part from the negligence of any of the officers,
> agents, or employees of such carrier, or by reason of any defect or
> insufficiency, due to its negligence, in its cars, engines, appliances,
> machinery, track, roadbed, works, boats, wharves or other equipment.

45 U.S.C. § 51.

To present a *prima facie* case under the FELA, a plaintiff must prove that:  (1) the

plaintiff was injured while in the scope of employment;  (2) the plaintiff's employment is

in furtherance of the railroad's interstate transportation business;  (3) the employer was

negligent; and  (4) the employer's negligence played some part in causing the injury for

which compensation is sought under the FELA. *Green v. River Terminal Ry. Co.*, 763

F.2d 805, 808 (6th Cir. 1985).  Federal common law controls what constitutes negligence

under the Federal Employers' Liability Act.  *Urie v. Thompson*, 337 U.S. 163, 174, 69

S.Ct. 1018, 1027 (1949) (footnote omitted).

To prove that the employer was negligent, it is well-settled that the FELA plaintiff

must "'prove the traditional common law elements of negligence:  duty, breach,

foreseeability, and causation.'"  *Adams v. CSX Transportation, Inc.*, 899 F.2d 536, 539

(6th Cir.1990) (quoting *Robert v. Consolidated Rail Corp.*, 832 F.2d 3, 6 (1st Cir.1987));

*Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255, 258 (2001).[2]     It is incumbent

on the plaintiff to prove all of the elements of his claim, including duty and breach of

duty.  *Aparicio v. Norfolk & Western Ry. Co.*, 84 F.3d 803, 810 (6th Cir. 1996),

*abrogated on other grounds*, *Reeves v. Sanderson Plumb. Prod., Inc.*, 530 U.S. 133

(2000); *Armstrong v. Kansas City Southern Ry. Co.*, 752 F.2d 1110, 1113 (5th Cir. 1985).

Railroads have a duty to furnish employees with a "reasonably safe place in which

to work and such protection [against the hazard causing the injury] as would be expected

of a person in the exercise of ordinary care under those circumstances."  *Urie v.*

*Thompson, supra*, 337 U.S. at 179 n. 16, 69 S.Ct. at 1029 n. 16, (citing *Sadowski v. Long*

*Island R.R. Co.*, 292 N.Y. 448, 55 N.E.2d 497, 501 (1944)).   Plaintiff's FELA claim in

this case is predicated upon Grand Trunk's alleged negligent pre-inspection of the subject

railcar.  However, Plaintiff has failed to present evidence of  the proper standard of care,

---

[2] Although Plaintiff is correct in that FELA has a relaxed standard of proof regarding *causation* ("Under this statute [FELA] the test of a jury case is simply is whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury," *Rogers v. Missouri Pacific RR. Co*., 352 U.S. 500, 506 (1957)), it is only this one *prima facie* element of a negligence claim that is relaxed; it does not relieve Plaintiff of the burden of proving duty and breach of that duty.  *See McKennon v. CSX Transportation, Inc*., 897 F. Supp. 1024, 1026 n. 1 (M.D. Tenn. 1994), *aff'd* 56 F.3d 64 (6th Cir. 1995); *see also*, *Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 597-89 (6th Cir. 2001).

i.e., "the ordinary care under the circumstances," by which such an inspection is to be measured.

Plaintiff purports to rely on the Affidavit of his expert witness, Michael Micek. Mr. Micek's affidavit, however, does not set forth any industry standard as to railcar inspection. Rather, he only conclusorily states that "[h]ad Grand Trunk Western Railroad, Incorporated conducted thorough and proper inspections of said car, it should have discovered that the AR door top canopy bolt. . . was defective as it was worn." Nowhere in Mr. Micek's affidavit does he say what the industry standard is.

Plaintiff also relies upon 49 C.F.R. § 215.9(c) and argues that this regulation requires that rail cars be defect free upon arrival and departure and that the railroad cannot move a defective car except to move it to the repair lot. In this regard, he also points to paragraph 6 of the Micek Affidavit in which Mr. Micek states:

> The Federal Railroad Administration rules and regulations regarding inspection of equipment applies to bi-level auto carrier[s] including the rail car TTGX985596 in question. Those regulations require that a car cannot be put into service unless the care is 100% defect free.

The regulation relied upon by Plaintiff and his expert, 49 C.F.R. §215.9, provides, in pertinent part, as follows:

> (a) A railroad freight car which has any component described as defective in this part may be moved to another location for repair only after the railroad has complied with the following:
>
> (1) A person designated under § 215.11 shall determine:
>
> (i) That it is safe to move the car; and

12

(ii) The maximum speed and other restrictions necessary for safely
conducting the movement; [and]

\* \* \*

(3) A tag or card bearing the words "bad order" of "home shop for repairs".
. . shall be securely attached to each side of the car. . . .

\* \* \*

(c) <u>Movement of a freight car under paragraph (a) of this section may be
made only for the purpose of effecting repairs. . . .</u>

As the Court observed at the July 20, 2006 hearing, this regulation sets a strict

liability standard.  FELA, however, is a negligence statute.  The Court notes that although

the Second and Seventh Circuits have stated that the principle of "negligence *per se*"

reaches injuries resulting from a FELA employer's regulatory violations, *see Morant v.

Long Island Railroad*, 66 F.3d 518, 523 (2nd Cir.1995); *Walden v. Illinois Central Gulf

Railroad*, 975 F.2d 361, 364 (7th Cir.1992), the Sixth Circuit has not so ruled.

In any event, even if our Circuit would hold that a regulatory violation establishes

negligence *per se* for purposes of a FELA cause of action, the regulation relied upon by

Plaintiff, 49 C.F.R. § 215.9, does not apply to the alleged defective component at issue.

This regulation only applies to freight cars having components "described as defective *in

this part*," i.e., in Part 215 of Title 49.  Parts 103 through 129 of Title 49, 49 C.F.R. §§

103-129, describe the defective components to which § 215.9 applies.  These include

defective wheel flanges (§ 215.103); defective axles (§ 215.105); defective bearings (§

215.107-119); defective frames or springs (§ 215.119); defective car center sills, plates or

13

coupler carriers (§ 215.121); defective couplers (§ 215.123-125); defective draft gears (§ 215.127); and defective cushioning devices (§ 215.129). Clamshell doors, which is the component part alleged to be defective in this case, are *not* among the defective components to which § 215.9 applies.

Plaintiff has not pointed to any cases construing this regulation nor has the Court found any such cases. However, as the subparts enumerated above make clear, only parts which affect the *movement of the car itself*, appear to be subject to the prohibitions of 49 C.F.R. § 215.9. Freight car doors do not affect the movement of the car itself. Therefore, the Court finds Plaintiff's reliance on 45 C.F.R. § 215.9 misplaced. Nothing alleged to have occurred in this case constitutes a violation of § 215.9 and, accordingly, the principle of "negligence *per se*," even if it were recognized in this Circuit, is inapplicable.

In sum, Plaintiff Van Gorder's failure to meet his burden to establish all of the elements of claim of negligence entitles Defendant Grand Trunk to summary judgment on Plaintiff's FELA claim.

14

CONCLUSION

For the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is granted and Plaintiff's Complaint is dismissed, in its entirety, with prejudice.[3]  Let Judgment be entered accordingly.




s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  September 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 27, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager

_____

[3]  Although Plaintiff attempted to argue at oral argument that, based upon the last paragraph of Mr. Micek's Affidavit, he can make out a strict liability claim under the Federal Safety Appliance Act ("FSAA"), contrary to Plaintiff's assertions, he did not allege a violation of Safety Appliance Act in his Complaint; he alleged only claims of negligence under FELA.

15